# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ROSEMARY MILLER,    :
           :
  Plaintiff,     :
           :
v.         :  CIVIL ACTION NO.
           :  1:08-CV-2014-RWS
THE HARTFORD LIFE AND  :
ACCIDENT INSURANCE   :
COMPANY, d/b/a THE    :
HARTFORD GROUP BENEFITS, :
           :
  Defendant.    :

## ORDER

   This case is before the Court for consideration of Plaintiff's Motion for

Summary Judgment [15] and Defendant's Motion for Trial on the Papers [16-1]

or, Alternatively, for Summary Judgment [16-2]. The Court treats the parties'

cross-motions for summary judgment as a trial on the papers pursuant to

Federal Rule of Civil Procedure 52(a). After reviewing the entire record, the

Court finds in favor of Defendant with the following findings of fact and

conclusions of law.

# I. Findings of Fact

## A. The group policy and the Plan

### 1.

Effective October 29, 2003, Hartford Life and Accident Insurance Company ("Hartford") issued the group policy to Insurance Services Organization ("ISO") to fund Accidental Death and Dismemberment ("AD&D") benefits under ISO's employee welfare benefit plan (the "Plan"). (Def.'s Mot. for Summary Judgment [16], Affidavit of Giuseppina Gulino, Exhibit 1, ¶ 4.)

### 2.

Under the caption "**ACCIDENTAL DEATH BENEFIT**," the certificate of insurance for the group policy ("the certificate") provides: "If a Covered Person's Injury results in loss of life within 365 days after the date of accident, we will pay the Principal Sum shown in the enrollment Form on file with the Policyholder." (Id., Certificate, Exhibit 2, p. COI000006.)

### 3.

The certificate defines "**Injury**" to mean:

> bodily injury resulting directly and independently of all other causes from an accident which occurs while the Covered Person is covered under this policy. Loss resulting from:

a)      sickness or disease, except pus-forming infection which occurs through an accidental wound; or

b)      medical or surgical treatment of a sickness or disease;

is not considered as resulting from Injury.

(Id. at COI000004.)

4.

Under the caption "Interpretation of Policy Terms and Conditions," the certificate states: "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (Id. at COI000021.)

**B. Plaintiff's claim for benefits under the Plan**

5.

The decedent, Mr. Miller, was an employee of ISO since March 1, 1992, and was a participant in the Plan. (See Claim File, Exhibit 3, p. CL000177-80.)

6.

As a Regional Vice President for ISO, Mr. Miller was eligible for two times his salary of $415,419.69 ($830,839.38) in AD&D coverage under the Plan. (Id. at CL000085.)

7.

3

Plaintiff was the sole beneficiary of any benefits payable by reason of Mr. Miller's death. (See id. at CL000178, CL000180.)

8.

Mr. Miller died on December 1, 2006. (Id. at CL000181.)

9.

On February 13, 2007, ISO submitted a claim for life and AD&D benefits on plaintiff's behalf, including a "proof of death" form, two certified copies of the death certificate, and Mr. Miller's benefit enrollment information. (Id. at CL000174-82.)

10.

Upon receipt of the claim, Hartford assigned the claim to Linda Durrance.  (Id. at CL000041.)

11.

By letter dated February 25, 2007, Hartford advised plaintiff that it had requested copies of the police report, the autopsy report, and the toxicology report, and asked plaintiff to complete a medical authorization form. (Id. at CL000172.)

AO 72A
(Rev.8/82)

12.

On March 12, 2007, Hartford received a "Medical Examiner's Report" dated January 20, 2007, which was comprised of (a) an Investigative Report by Ray H. Rawlins, Forensic Investigator; (b) an Autopsy Report by Carol A. Terry, M.D.; (c) a postmortem blood alcohol test report; and (d) a postmortem toxicology report. (Id. at CL000146-64.)

13.

The toxicology report was negative for all substances, and the blood alcohol results were negligible. (Id. at CL000162-63.)

14.

In his Investigative Report, Mr. Rawlins stated that the emergency medical services ("EMS") and witnesses revealed that Mr. Miller was swimming laps at Swim Atlanta "when he suddenly grimaced and submerged." (Id. CL000148.)

15.

In addition, Mr. Rawlins reported that "[w]itnesses immediately recovered him from the pool and began CPR while EMS responded." (Id.)

16.

Mr. Rawlins provided the following "Summary and Conclusion:
The information received from witnesses is suggestive of a natural disease
event occurring while the decedent was swimming, subsequent [sic] to his
unrecoverable submersion. This opinion is, however, in no way conclusive. The
final cause and manner of death will be determined by the Medical Examiner.
All available information and evidence will be made available for her review."
(Id. at CL000149.)

17.

Mr. Rawlins also noted that plaintiff reported "that her husband had been
swimming in the morning three times per week for five years at Swim Atlanta
and was in excellent physical health." (Id. at CL000148.)

18.

After performing a physical examination and autopsy, Dr. Terry provided
a "Summary of Findings," in pertinent part as follows:

I.    Evidence of drowning

      A.    Reported witnessed event of subject becoming submerged in
            public pool

      B.    Fluid in sphenoid sinus

      C.     Mild pulmonary edema

II.    Cardiovascular disease

      A.     Moderate-to-marked atherosclerotic coronary artery disease

      B.     Remote myocardial scarring, left ventricle

      C.     Mild biventricular hypertrophy, consistent with reported history of hypertension

      D.     Atherosclerosis of mitral and aortic valves

      E.     Mild atherosclerosis of thoracoabdominal aorta

III.   Microscopic arteriovenous malformation of cerebral cortex

. . .

VII.  No evidence of significant acute traumatic injury

(Id. at CL000159-60.)

19.

Dr. Terry concluded that the cause of death was "drowning," that other significant conditions included "atherosclerotic coronary artery disease," and that the manner of death was "accident." (Id. at CL000160.)

20.

Dr. Terry opined:

This 56-year old white male, Robert Miller, likely died as a result of drowning. Based on the autopsy and the reported circumstances,

it is likely that the subject experienced a cardiac event that resulted in his becoming submerged while swimming. This scenario is consistent with a natural disease process occurring in a hostile environment (i.e. the water of a swimming pool), resulting in the subject's death. The subject showed evidence of previous scarring of heart muscle, indicative of prior insufficient blood flow to the heart. There was no evidence of a catastrophic natural disease process, malignancy, or systemic infectious disease processes.

(Id. at CL 000160-61.)

## 21.

The death certificate listed the immediate cause of death as "drowning," and listed "Atherosclerotic coronary artery disease" as an "other significant condition," defined as "conditions contributing to death but not related to cause given in part 1A" (immediate cause section). (Id. at CL000181.)

## 22.

On March 28, 2007, Ms. Durrance made the following entry in her notes:

Reviewed Coroner's Report and Investigative Report. Insured grimaced and submerged in the pool he was swimming in. He was rescued and given CPR but did not survive. The Autopsy Report indicated he did have water in his sinuses and froth in lungs and he had been wearing a swimsuit but he had moderate to severe atherosclerotic heart disease and prior heart damage. He apparently had severe heart pain and unfortunately was in the water at the time and was unable to get himself to the side of the pool and he drowned. The policy defines injury as directly and independently and his drowning was not directly and independently of all other causes, but was began [sic] with severe

8

heart pain that caused him to not be able to get out of the water.
Will deny claim and refer to next level for review.

(Id.)

23.

Subsequent to the entry of the foregoing note, Ms. Durrance entered the

following: "Correction to last note of 3/28/07, the information in the file was

reviewed again and there are no statements in the documents containing this

information." (Id.) The only mention of a "cardiac event" in the reports

reviewed by Ms. Durrance when she made the March 28 entry was the

statement by Dr. Terry that "it is likely that the subject experienced a cardiac

event that resulted in his becoming submerged while swimming." (Id. at

CL000160-61.) The EMS Report had not been received by Hartford when

these entries were made.

24.

On April 2, 2007, Hartford requested the EMS report regarding Mr.

Miller. (Id. at CL 000143.)

25.

With a letter dated June 17, 2007, plaintiff provided Hartford with a

billing summary from Gwinnett County EMS and a "Prehospital Patient Care

Report." (Id. at CL000075-81.)

26.

The report indicated that Gwinnett County EMS was dispatched to transport Mr. Miller at 7:15 a.m. on December 1, 2006. (Id. at CL000080.)

27.

The report identified the "type of patient" as "Cardiac Arrest – Resuscitation in progress." (Id. at CL 000078.)

28.

The "Chief Complaint" and "Reason for Call" were listed as "Cardiac Arrest," and the "Severity Impression" was stated as "Obvious Death." (Id.)

29.

In addition, the EMS personnel described the situation in relevant part as follows:

> Medic 25 RFQ out of first DO area with company 20 to a report of a 56 y/o male possible near drowning at a public pool. Per bystanders [patient] was swimming when he appeared to have a heart attack or some other distress when he went under the water. [Patient] was submerged approx 30-40 seconds before rescuers could pull him out of the water. [Patient] was having apparent agonal respirations upon company 20s arrival on scene. Company 20s responders found [patient] unresponsive agonal respirations with pulse but [patient] became pulseless during assessment. CPR

began . . . . Upon medic 25 arrival on scene [patient] still
unresponsive not breathing/pulseless.  Still in asystole . . . . CPR
and ALS procedures continued enroute without change in [patient]
status . . . . [Patient] remained in asystole upon transfer to ER staff
. . . .

(Id. at CL000079.)

30.

On June 28, the Claim File was transferred to Lou Davia, and on July 18,

he requested that Pat Hipsher review the file and discuss it with him.  (Id. at

CL000071-72.)

31.

On July 19, Mr. Davia submitted a "rush" request for a nurse consultant

review specifically asking the following:

Please review the Autopsy Report, EMS Report, Forensic
Investigator's Report and any other data to identify the amount of
fluid in the lung to substantiate the manner of death as "drowning."
Please also review the Cardiovascular findings and provide the
significance of the blockage/stenosis in relation to the "cardiac
event."  Is the medical history reported indicative of a significant
cardiac compromise?  What, if any, significance do the fractured
ribs indicate?  Based on the amount of fluid in the lungs or
chest/sinus cavities, in your opinion, did the Insured's cardiac
event precipitate the under water event?  Were the actions taken by
the EMS and, subsequently by the emergency room staff,
indicative of a cardiac protocol response or a drowning protocol
response?

(Id. at CL000069-70.)

32.

Kathleen M. Bell, R.N., a nurse consultant for Hartford, issued a Nurse Consultant Report on July 20, 2007. (Id. at CL000043-45.)

33.

Ms. Bell provided the following conclusions: "1. Apparent drowning related to a submersion in pool precipitated by a cardiac event. 2. Perimortem Rib Fractures were probably related to the prolonged CPR efforts. 3. Mucosal contusions of the proximal esophagus probably were related to the oral intubation procedure." (Id. at CL000045.)

34.

On or about July 30, 2007, Hartford paid plaintiff $884,486.25, representing basic life insurance benefits in the amount of $333,000, supplemental life insurance benefits in the amount of $500,000, and interest in the amount of $51,486.25. (Gulino Affidavit, Exhibit 1, ¶ 16.)

35.

By letter dated July 30, 2007, Hartford advised plaintiff that no accidental death benefits were payable because Mr. Miller "did not sustain bodily injury which resulted directly and independently of all other causes from an accident." (Claim file at CL000026-29.)

36.

Hartford advised plaintiff of her right to appeal its benefits decision. (Id. at CL000028-29.)

37.

Plaintiff, through her attorney, appealed Hartford's decision by letter dated September 24, 2007. (Id. at CL00012-16.)

38.

Plaintiff's attorney argued that Dixon v. Life Ins. Co. of North Am., 389 F.3d 1179 (11th Cir. 2004) and Smith v. Continental Cas. Co., 2007 WL 2071538 (N.D. Ga. Jul. 16, 2007) "mandate coverage for this claim."

39.

Hartford acknowledged plaintiff's appeal by letter dated September 28, 2007. (Id. at CL000019.)

40.

Hartford's appeals specialist reviewed the documents in the claim file, along with the arguments presented by plaintiff's attorney, and upheld the denial of benefits on appeal by letter dated December 5, 2007. (Id. at CL000006-7.)

41.

AO 72A
(Rev.8/82)

The appeals specialist discussed the applicable language of the group policy, the EMS report, and the medical examiner's report, and concluded: "Since your client's death was not the direct result of an injury independent of all other causes, we are unable to reverse the previous decision rendered and benefits remain denied." (Id. at CL000007.)

42.

Further, the appeals specialist advised that plaintiff's administrative remedies has been exhausted. (Id.)

**C. Conflict of Interest**

43.

Plaintiff asserts that Hartford's decision was affected by its conflict of interest. In support of her assertion, Plaintiff argues that Ms. Durrance made a decision to deny the claim based on limited information and unsupported factual conclusions. Plaintiff also argues that Hartford selectively focused on facts generated by claims people rather than medical opinions. Plaintiff also criticizes Hartford for not interviewing any of the witnesses or medical experts. (Pl.'s Response Brief [22] at 7-15.)

AO 72A
(Rev.8/82)

44.

As evidence of steps taken by Hartford to reduce potential bias and promote accuracy, Hartford offers the declaration of Giuseppina Gulino, an Appeals Specialist with Hartford. He states that the decision to deny plaintiff's claim for benefits was based solely on the relevant provisions of the Plan and the medical and other information contained in the administrative record. (Gulino Aff., Ex. 1, ¶ 15.)

45.

In part to independently assess the accuracy of claim decisions, Hartford has in place a Quality Assurance program. (Id. at ¶ 10.)

46.

Hartford does not establish numerical quotas requiring a certain number of claim approvals or denials (Id. at ¶ 11), and employees are not evaluated on the number of claims approved or denied. (Id. at ¶ 12.) Rather, employees are evaluated, in part, on the quality, accuracy, and timeliness of their claim investigations and decisions, *i.e.*, whether the claims were investigated and decided in accordance with the applicable plan documents. (Id.)

AO 72A
(Rev.8/82)

47.

Hartford maintains a separate Appeals Unit for the independent consideration of denied claims. (Id. at ¶ 13.)  Members of the Appeals Unit are charged with making independent assessments of the underlying claim decision based on all of the evidence in the claim file. (Id. at ¶ 14.)

48.

Members of the claims department and Appeals Unit are compensated as employees in accordance with the terms of their individual employment with Hartford. (Id. at ¶ 17.)  They are not provided benefits, bonuses, commissions, promotions, or any other incentives, financial or otherwise, based on the number of benefit claims that they approve or deny. (Id.)

**II. Conclusions of Law**

1.

Plaintiff's claims arise under section 502 of ERISA's statutory scheme, 29 U.S.C. § 1132(a)(1)(B).

2.

Hartford moved the Court for judgment after trial on the papers pursuant to Fed. R. Civ. P. 52(a) [16-1], or alternatively for summary judgment pursuant

AO 72A
(Rev.8/82)

to Fed. R. Civ. P. 56 [16-2]. Plaintiff also filed a motion for summary judgment [15].

3.

"Summary judgment is normally appropriate where no genuine issue of material fact exists, and such an issue exists only where a reasonable fact finder could find in favor of the nonmoving party." Mack v. Metropolitan Life Ins. Co., 2007 WL 1720471, *2 (11th Cir. June 15, 2007) (citations omitted).

4.

However, "[i]n an ERISA benefit denial case . . ., the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat'l Serv., Inc., 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (citation omitted).

5.

This Court agrees with the reasoning in Crespo v. Unum Life Ins. Co. of Am., 294 F.Supp.2d 980 (N.D. Ill. 2003), in which the district court explained:

> A trial on the papers offers certain advantages over cross-motions for summary judgment. It is certain to result in a decision for one party rather than present the risk of a non-decision if the cross-motions for summary judgment are both denied . . . .

17

Additionally, where an ERISA plan contains language that confers discretion to the plan administrator, a court applies the arbitrary and capricious standard of review and will disturb the benefit determination only if it is "downright unreasonable." . . . If this ERISA issue is reviewed in the context of summary judgment, a court must determine the reasonableness of the plan administrator while drawing all inferences in favor of the claimant . . . . Such an exercise during cross-motions for summary judgment represent[s] wasted effort by the parties and the court that can be avoided easily by proceeding by means of a trial on the papers. Even though under both processes judicial review is limited to the evidence that was submitted in support of the application for benefits . . ., if a question of fact arises a court must deny the cross-motions for summary judgment and set the case for trial. Reviewing the identical record pursuant to a Rule 52(a) trial on the papers, the same court can decide the case and resolve any fact questions. Clearly, it is more efficient to reach the same determination on the same record by skipping cross-motions for

> summary judgment and proceeding directly to a trial on the papers, where all possible issues can be resolved by the court.

Id. at 991-92.

6.

Fed. R. Civ. P. 52(a)(1) provides in pertinent part:

> In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court. . . .

7.

Thus, the Court has considered this case in the context of a trial on the

papers, which constitutes the trial of this case, but without the need for the parties or counsel to appear, because the Court's review of the papers is limited to the administrative record, aided by the parties' briefs. See Eldridge v. Wachovia Corp. Long-Term Disability Plan, 2007 WL 117712, *1 (11th Cir. Jan. 18, 2007) (quoting Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989), for the proposition that, on review by the court under a deferential standard, "[t]he record is restricted to 'the facts as known to the administrator at the time the decision was made.'").

8.

"ERISA . . . places the burden on the claimant to demonstrate she is entitled to benefits under the plan. . . ." Brucks v. Coca-Cola, 391 F. Supp. 2d 1193, 1204 n.12 (N.D. Ga. 2005); see also Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).

9.

Thus, plaintiff "must prove by a preponderance of the evidence that [she] is entitled to . . . [accidental death] benefits within the terms of the policy." Papczynski v. Connecticut Gen. Life Ins. Co., 730 F. Supp. 410, 413 (M.D. Fla. 1990).

10.

19

In this case, plaintiff bears the burden of proving that Mr. Miller's death resulted from an injury, which is defined by the Plan to mean "bodily injury resulting directly and independently of all other causes from an accident which occurs while the Covered Person is covered under this policy." See Stamp v. Metropolitan Life Ins. Co., 2008 WL 2571408 (1st Cir. June 30, 2008) ("Because we are concerned with the definition of "accident" as a threshold of eligibility for benefits, the burden of proof is on [plaintiff] to show the existence of coverage.").

11.

"A denial of benefits under an ERISA plan must be reviewed *de novo* 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Lee v. Blue Cross Blue Shield of Ala., 10 F.3d 1547, 1549 (11th Cir. 1994) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).

12.

Where the plan does give such discretion to the claims administrator, the court is to review the denial of benefits under an arbitrary and capricious standard. Id. at 1550.

20

13.

The plan language stating that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy" confers discretion on Hartford. See Daniels v. Hartford Life & Acc. Ins. Co., 898 F. Supp. 909, 910 (N.D. Ga. 1995).

14.

In Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S. Ct. 2343 (2008), the Supreme Court held it was not "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." Id. at 2351. Rather, "conflicts are but one factor among many that a reviewing judge must take into account."

15.

Prior to Glenn, district courts in the Eleventh Circuit were required to follow a six-step analysis for reviewing cases involving conflicted fiduciaries under a heightened arbitrary and capricious standard of review, as set forth in Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132 (11th Cir. 2004). The six-step framework outlined in Williams is as follows: (1) Apply the

*de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision; (2) If the administrator's decision in fact is " *de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision; (3) If the administrator's decision is " *de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard); (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest; (5) If there is no conflict, then end the inquiry and affirm the decision; and (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it. Id. at 1138 (footnotes omitted).

16.

In Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352 (2008), the Eleventh Circuit held:

We continue to adhere to <u>Firestone</u>'s mandate that reviewing courts must consider an administrator's conflict of interest in deciding whether the decision to deny benefits was arbitrary. But we hold that <u>Glenn</u> implicitly overrules our precedent to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard. We hold that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious. And we hold that, while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.

<u>Id.</u> at 1360.

17.

Hartford's decision should be upheld if the Court determines that it was the product of a deliberate, principled reasoning process, and that it is supported by substantial evidence in the administrative record. <u>See</u> <u>Glenn v. MetLife</u>, 461 F.3d 660, 666 (6th Cir. 2006), <u>aff'd</u> <u>Metropolitan Life Ins. Co. v. Glenn</u>, ___ U.S. ___, 128 S. Ct. 2343 (2008) ("Under [the arbitrary and capricious] standard, we will uphold the administrator's decision 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'").

23

18.

With regard to the conflict factor, the Court concludes that Hartford's decision was not affected by a conflict of interest. The decision is consistent with findings by disinterested witnesses, including Dr. Terry, Mr. Rawlins, and the EMS personnel.

19.

Under the arbitrary and capricious or abuse of discretion standard, "the scope of the court's review is narrow and the court is not to substitute its judgment for that of [Hartford]." Brooks v. Protective Life Ins., 883 F. Supp. 632, 638 (M.D. Ala. 1995). "[A]n abuse of discretion or arbitrary and capricious standard means that the reviewing court will affirm merely if the administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker." Callough v. E.I. du Pont de Nemours & Co., 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996); see also Carr v. The Gates Health Plan, 195 F.3d 292, 294 (7th Cir. 1999) ("Under the arbitrary and capricious standard, it is not [the Court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority."). As a result, this Court is "limited to determining whether [Hartford's decision] was made

rationally and in good faith – not whether it was right." <u>Griffis v. Delta Family-Care Disability</u>, 723 F.2d 822, 825 (11th Cir. 1984).

20.

In order to qualify for accidental death benefits under the Plan, Mr. Miller's death had to be caused by "bodily injury resulting directly and independently of all other causes from an accident . . . ."

21.

In the context of accidental death claims, the Eleventh Circuit has adopted the "substantially contributed" test: "a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss." <u>Dixon</u>, 389 F.3d at 1184. The Court reasoned:

> [A]n overly strict interpretation of "directly and from no other causes" would provide insureds, or their beneficiaries, with coverage only where the insured was in perfect health at the time of an accident. The "substantially contributed" test gives this exclusionary language reasonable content without unreasonably limiting coverage. And, it advances ERISA's purpose to promote the interests of employees and their beneficiaries.

<u>Id.</u>

AO 72A
(Rev.8/82)

22.

The Court turns now to application of the <u>Williams</u> test as modified by the decision in <u>Doyle</u>.[1]  Applying the *de novo* standard to the claim administrator's decision as required by step one, the Court concludes that the decision is not wrong.  The administrative record supports the conclusion that a cardiac event due to heart disease was a substantially contributing cause of Mr. Miller's death.

23.

In that regard, the eyewitnesses stated that Mr. Miller was swimming and suddenly grimaced then went under water. Further, they stated that he was only submerged for 30-40 seconds before they pulled him from the pool. Moreover, the paramedics noted that Mr. Miller was in cardiac arrest, was breathing abnormally, and had a pulse when they arrived on the scene, but that he "became pulseless" shortly thereafter. Indeed, the medical examiner concluded

---

[1]In <u>Doyle</u>, the district court omitted step one of the <u>Williams</u> test and assumed that the administrator's decision was wrong.  The appeal addressed the effect of a conflict of interest on the standard of review of the reasonableness of the administrator's decision.  Thus, for purposes of its analysis, the Court of Appeals expressed no opinion on whether the decision was right or wrong, but simply reviewed the finding on reasonableness by the district court.  Because the Court of Appeals did not abandon the <u>Williams</u> test, this Court will apply it.  Finding that the administrator's decision was not wrong ends the inquiry under <u>Williams</u>, but necessarily also means that the administrator's decision was reasonable.

that it was "likely that [Mr. Miller] experienced a cardiac event that resulted in his becoming submerged while swimming," which was "consistent with a natural disease process occurring in a hostile environment (i.e. the water of a swimming pool), resulting in [Mr. Miller's] death."

24.

The Court finds that these facts are entirely consistent with Hartford's determination that Mr. Miller did not die from drowning with no other substantial cause.

25.

As such, the Court finds that substantial evidence in the record before Hartford supports the decision to deny benefits, and that Hartford's decision was therefore reasonable.

Based on the foregoing, Plaintiff's Motion for Summary Judgment [15] and Defendant's Motion for Summary Judgment [16-2] are **DENIED**. Defendant's Motion for Trial on the Papers [16-1] is **GRANTED**. Having conducted a trial on the papers, the Court finds in favor of Defendant Hartford Life and Accident Insurance Company. The Clerk shall enter **JUDGMENT** in favor of Defendant.

AO 72A
(Rev.8/82)

**SO ORDERED**, this  17th  day of March, 2010.


_____

**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)